Case number 14-6262, John Russell et al. v. Allison Lundergan-Grimes et al. Oral arguments not to exceed 15 minutes per side. Those 15 minutes are to be shared by the defendants. Ms. Zellin for the appellants. Thank you. Good afternoon. May it please the court, my name is Lynn Zellin. I'm counsel for the State Board of Elections defendants in this case. And I'm going to first address the issues related to whether the State Board of Elections defendants are proper parties in this litigation. And then Mr. Walburn, counsel for the Attorney General, will address those questions as they relate to his client as well as the merits of the plaintiff's lawsuit. We intend to reserve three minutes of our argument time for rebuttal. The facts and the legal issues that are involved in this case are not disputed and they've been fully briefed. This case involves the constitutionality of KRS 117-235 sub 3, which prohibits express advocacy electioneering within 300 feet of a polling place on the day of an election. It also involves the preliminary jurisdictional matter of whether the Commonwealth defendants, all of whom are state officials named in their official capacities, are proper defendants and whether the plaintiffs have stated a claim against them. Would you agree with me as a general proposition that if somebody wants to challenge a state statute, particularly one that's been enforced by somebody against them, that there has to be somebody that they sue? If it has been enforced against them by somebody, then yes, there is someone for them to sue. But it's been enforced by the county against them, right? Yes, and that's who the proper defendant would be. So you're saying that you can't challenge anybody on the state level if it's only been enforced by the county even though it's a state statute? Correct. Do you have any authority for that? Under this court's decision in Children's Healthcare v. Dieters, a state official's immunity under Ex parte Young is avoided only if that official has a duty to enforce the challenge law and has either threatened to enforce the law or is about to commence proceedings to enforce it. In this instance, the only threat or imminent proceedings to enforce the statute were at the hands of the Campbell County defendants, the Campbell County Sheriff's Department to be exact. I want you to assume for just a second that the esteemed author of that case, who perhaps is here, didn't really go as far as you think she did or perhaps it's 20 years old and really is not consistent with modern jurisprudence anyway about threats. So I want you to assume for a second, even though you disagree, that you ought to be able to sue somebody in the state. Now, if I'm right about that, who would you sue? I think the purpose of the Ex parte Young exception is to enjoin an ongoing violation of constitutional rights. And so I think it would have to be an official who had a duty and a practical ability to... Okay, this case, just pick somebody. If I was to pick somebody, it would be, at a minimum, be the Attorney General, wouldn't it? I represent the State Board of Elections and I would tell you that it would not be the State Board of Elections because... I got that. So Attorney General makes sense, right? He enforces... Well, the Attorney General does have general authority to enforce the election laws of the state. So if it is proper to sue the Attorney General in connection with the constitutionality of the statute, which requires some assumptions you don't want to make, then I'm just curious, it's a long way of getting here, why do we really care about the Secretary of State and the Election Board? I think that... As long as somebody is the right person to sue, do we care? Do we care whether it's the Secretary of State and the State Board of Elections? As long as it's somebody, and I'm suggesting that's probably the Attorney General, do we really have to spend time on your issue? Well, the district court disagreed with me on my issue, which is whether the State Board of Elections is a proper defendant and whether we are entitled to immunity. So I am requesting that the court reverse that ruling by the district court and find that the State Board of Elections defendants are immune and they were not proper parties to this lawsuit and should have been dismissed. So to that extent, yes, I do think that the court needs to consider that question. I think there's ample jurisprudence that just because a state law is being challenged doesn't automatically make a state official a proper defendant. There has to be a connection to the enforcement of the act, a special connection. And that's not present with respect to the State Board of Elections and the State Board of Elections defendants. And what's really missing from the plaintiff's complaint in this case and from their own description of the facts of their lawsuit is any action by any of the Commonwealth defendants to enforce this law. With respect to the State Board of Elections, it goes even further. Let me ask you the same question that I'm going to ask your fellow counsel representing the Attorney General. On behalf of your two clients, do you expressly disavow any intention to enforce this statute in the future? Under Kentucky law, the State Board of Elections defendants don't have any authority to enforce the law. That isn't what I said. Are you authorized to say that your clients will never do anything, whatever that might be, to seek enforcement of or vindication of this statute? Yes, we don't have any authority to either directly enforce the law ourselves, whether that would be removing signs or seeking prosecution. And we also have no authority to control the officials who have been delegated the authority to enforce, which include county clerks, deputy county clerks, precinct election officials, and law enforcement officials. The State Board of Elections doesn't have any authority to control those officials and therefore would have no ability to seek any enforcement of this law. I think my time is about up, so I will let Mr. Walburn take over from here, but I'd be happy to answer any other questions from the court. Thank you. Thank you. Good afternoon, and may it please the court. My name is Jacob Walburn, and I'm here on behalf of Kentucky Attorney General Jack Conway. Much as Ms. Zellin was doing during her time, I would also submit that the Attorney General is not a proper party in this matter. So who would you say they should have sued? I believe the Campbell County defendants were the appropriate defendants in this action. So really, it's a state statute and the only people you can sue are county people? Well, I think the jurisdiction... Does that make sense to you? I think it does, and I think it does for two separate reasons. First of all, the jurisprudence of this circuit suggests that there is an element of action, credible threat, imminent threat, subjects or causes to be subjected is the language under 1983. As to a threat, same question I posed to your counsel, as inarticulate as it might have been, can you, on behalf of the Attorney General, say that he will never enforce this statute? No, I cannot. I'm not authorized. Then why is that not a credible threat? Simply because we have to look at the record evidence in this case. As it was applied to Mr. Russell, as it was applied to the plaintiff in this case, he was not even actually prosecuted. His signs were seized by local officials. There's been much ado made in the briefs regarding a 2010 complaint received by the Attorney General's office with the same conduct, giving the Attorney General notice that signs were on the Appalese property. The Attorney General did not go and seize those signs. No representatives from the Attorney General seized those signs. I think credible threat goes to more than just what has been done in the past. What does the record evidence show? There's no evidence that the Attorney General was going to seek enforcement of the statute with respect to Russell. I think under Burson, we know that, simply stated, had instead of it 300 feet been 100 feet, there would be no issue here. So he's settled with the county, doesn't have to worry about the county anymore, whatever the terms of that settlement are. Now he basically, in your mind, has to wait to see if your client enforces the statute. Then, and only then, can he challenge the facial or the as-applied constitutionality of the statute. I think under 1983, yes, 1983 requires a subjecting or cause of subjection to deprivation of constitutional rights. He may have more of an option under the Declaratory Judgment Act, but I still think in respect to this case, he lacks standing generally. Under the Lujan case, we know that injury, in fact, causal connection between the injury and the challenge conduct, and a favorable decision would redress the issues that he was facing, would confer standing. Enjoining the Attorney General does nothing to enjoin any other potential enforcers of the statute. Not all law enforcement that has jurisdiction in Campbell County, Kentucky, has been deprived of enforcing the statute, should they deem so fit. The injunction only applies to the Sheriff's Office. Mr. Russell's business is within the city of Alexandria. They have a police force. The Kentucky State Police maintains statewide jurisdiction to enforce the criminal laws of the Commonwealth. Simply put, enjoining the Attorney General does nothing to prohibit future enforcement, and so I don't believe he's able... Seriously, you think that if the Attorney General gets enjoined, the county or the local police, there's a credible threat the local police are then going to enforce a statute that the Attorney General of the state has been enjoined from enforcing? Well, I don't believe that there would necessarily be a credible threat. What I'm suggesting is that that injunction, as it pertains to the Attorney General, would do nothing to remedy the issues that Mr. Russell would face. The Attorney General has no practical supervisory authority over anyone. Let me get this straight. You've got a state statute. You have to sue only those people that have enforced it, and then you have to pick off one by one all the people that theoretically might enforce it. You just can't go to the Attorney General. No, I don't believe you can just go to the Attorney General. Okay, I got it. I'm done. Additionally, I would like to address the constitutional issue, the merits of this case. As this court has acknowledged in the stay order that was issued, we're existing in a jurisprudential gray area. I thought that was a very apt description. We know that under the Burson case, a 100-foot ban on electioneering, with no private property exception, passes constitutional muster. We know under this court's decision in Anderson that a 500-foot ban, with a private property exception, does not pass constitutional muster. In other words, we reside squarely in the middle of the jurisprudence on this issue. Does the Burson court actually address the private property issue, or is it simply silent on the subject? It addressed passingly in a footnote that situations like that described here might be more apt to an as-applied challenge, and I tend to agree that that would have been the proper course of conduct here. Clearly, there's a concern over private property, but what Burson instructs us to do is first examine, is there a compelling state interest? I don't think anyone has put an interest that Kentucky's interest in regulating its elections, preventing voter fraud and intimidation, is compelling. But it also requires narrow tailoring. But it's actually not narrow tailoring, it's really more of a modified burden that says the law is reasonable and does not significantly impinge on rights. The Kentucky law is as least restrictive as is possible to prevent the evils that it's targeting. The law is limited in time. It only applies on Election Day. Mr. Russell is free to display his signs at any time other than Election Day. It only applies to express advocacy. It's only expressly advocating for a candidate or for a ballot issue that applies. And it's limited in scope. It's smaller than the 500 feet that this court took issue with in Anderson. It has been scaled down to 300 feet. Why does Kentucky need the 300-foot radius rather than the 100 feet? Kentucky has a long and troubling history, as I'm certain this court is aware, in its criminal docket with voter intimidation, vote fraud, vote buying, signaling, several issues. Kentucky clearly has a compelling interest in maintaining the integrity of its elections, and frankly, that's a big problem in Kentucky. Those concerns continue to today? Yes, sir, they do. We have, in a separate case in the Eastern District of Kentucky, the court has taken notice of 28 vote buying prosecutions, I believe, in the last decade. Frankly, we have trouble with our elections in the Commonwealth. Even conceding that, what is it in the record that shows us that it is necessary to have the 300-foot radius rather than the 100 foot? I would point to a phrase that actually appeared in the Appellee's Brief, the former testimony of former Secretary of State Trey Grayson, where he mentioned that the goal of this legislation was to comply with the spirit of preventing voter fraud and voter intimidation. My question wasn't about spirits. My question was what in the record provides the evidence that Kentucky can't be effective within a 100-foot range but has to have at least a 300-foot range? Well, I don't know that there is specific evidence regarding a 100 versus. . . Whose burden would it be to show us that? That is the state's burden in this matter. Well, the Supreme Court's told us you don't have to have empirical evidence. Correct. But tell us, just give us some sort of sense as to why 300. The only thing that I deduce from this that you've said in support of the 300 is it's not 500. Generally, some of the different vote fraud issues that Kentucky has faced, and I will concede that the more recent trend or at least the more recently prosecuted cases have to do with absentee voting. There have previously been issues of signaling. That is, someone lingers near the polling place having purchased a vote and signals another to make payment. 300 feet, as just an example, is a more difficult distance to discern physical signaling than would be 100 feet. I attend many football games. 100 feet is very viewable from one end to the other. It is simply a football field. But it makes it a lot more difficult. It's 100 yards, 300 feet. I'm sorry. Does that address the question? So signaling, what is signaling again? Signaling is a practice that is, frankly, somewhat common in eastern Kentucky, an individual's approach to have their vote purchased. In order to determine whether that person has actually gone through with that, someone will monitor the individual going into the voting. How do they know which way he voted? That is obviously a bit more problematic. I don't think so. I think the more specific issue is oftentimes the votes may be purchased and no vote is cast. It's simply a mechanism of ensuring that a vote has been cast. Okay, so 300 feet as opposed to 100 feet would keep the person signaling back? It would simply be more difficult to discern the signal, however that signal. That's but one specific example of others. I can cite other examples if the court would like. Yeah, go ahead. 300 feet, one football field. If we're talking about voter intimidation versus just a vote fraud or a vote buying, that's roughly the distance of most parking lots. People coming up to scream express advocacy at you, to attempt to intimidate you into changing your vote. We are providing those people with a buffer zone to vote without fear of intimidation. Obviously, we're not trying to enjoin all level of political speech. We're only seeking to enjoin express advocacy, that kind of express advocacy that can have an impact on voter intimidation to certain voters who would be approaching the polling place. 300 feet insulates them from being intimidated on their way in to cast their vote. I see my time has elapsed. Thank you. Good afternoon, Your Honor. My name is Chris Wiest, and along with my co-counsel, Brandon Volker, Jack Gatlin, and Tom Bruns, I represent the appellees in this matter, John Russell and Campbell County Auto Body. I think Mr. Walburn said it best when we look at the threat of enforcement, when he said, let's look at the record evidence in this case. And we've got record evidence filed at docket entry number 50 in the district court, and we've got some complaints that have been processed by both the Kentucky Attorney General and the State Board of Elections. And there's just a couple that I want to draw the court's attention to because I think they really make the case that the arguments that you've heard today from the state, including the most recent disavowal from the State Board of Elections, simply are not consistent with past history as to what's actually going on. And I think when you look at those, no rational person can look at the evidence I'm about to point out and sit there and say there is not a credible threat of enforcement. I'm going to start, Your Honor, on page 41 of that particular docket entry, and we've got the Attorney General's office directing, actually the State Board of Elections is within this complaint, talking about them calling the LaRue County Clerk and advising them that the private property is not exempt. And when we look at the state statute, that makes sense. When you look at KRS 117015, and that's the statute that governs what the State Board of Elections does here, there's a directive, and that's important under Ex parte Young, that's a special connection. They are directed that there shall be a State Board of Elections which shall, it's not discretionary, shall administer the election laws of the state. They've got the power to issue orders under that same statute, to direct compliance and to direct other officials. In essence, what they're saying is we're not actually going out, we're not the tip of the spear, we're just the puppet masters that are directing what's going on here. So you can't hold us liable, even though we're the ones that are out there doing the enforcement. I'm just fascinated why you want to start out and spend a bunch of your time on the election board and the Secretary of State. You've only got 15 minutes. Well, Your Honor, here's my concern. My concern is that, and this court pointed out in Voinovich, we've got to have the right parties in joint to make sure that my client's not going to be prosecuted and he's not going to be pursued. And you think they're better than the Attorney General? I don't, Your Honor. I think that they're all necessary under Voinovich. All right. So if you get the Attorney General, hypothetically, do we really need to spend time, same question I asked your other counsel, on the Secretary of State and the election board? I don't, Your Honor, but here's my concern. My only concern is so the Attorney General sits there and says we're not going to enforce it, but the State Board of Elections goes out and directs somebody else to do it. And so, and I suppose the argument is, well, they are a party in privity with the AG, and so we're perhaps covered, and maybe that's true, and if that's true, we don't care. My only concern is to make sure that our client isn't going to be prosecuted or pursued for exercising his First Amendment rights. And that's what Voinovich stands for. It stands for the proposition that you've got to name the right parties. Let's get to the merits then. Your Honor, looking at the merits of the case, and I agree, we've got the Burson and we've got the Anderson case, but I think really where I'd like to begin that discussion is actually with the statute that's being challenged itself, KRS 117.235. And we look at a 300-foot buffer. There is no private property exception. I know, Judge Batchelder, Your Honor, I know you authored the Anderson case. You called it requisite, and it is requisite, and I'm going to talk about why it's requisite in a minute as to why we've got to have a private property exception. But when we look at the definition of electioneering, within that statute, it says, electioneering shall include the displaying of signs, which is part of what's at issue in this case, but it's far, far more than that. It also includes the distribution of campaign literature. So if Mr. Russell, for instance, goes and hands his spouse, who may visit him on his property, you know, a campaign flyer on private property, he's in violation of the statute. We've got this... Let's look at the flip side of that. At least where I'm from, and maybe Kentucky's different, most polling places are at local elementary schools because they're the public locations that are close to where the voters are. So almost by definition, they're in neighborhoods. They're surrounded by private property. So to say that you had to exempt from a constitutional dimension standpoint all private property would essentially mean you could only ban electioneering on the elementary school property itself. And where do you drive authority for that? Your Honor, I would point out two prospects for that. First of all, the Burson case itself. In Burson, we had a 100-foot buffer, which is obviously we're looking at 30,000 square feet of area that's being banned in that case. You're not really getting off typically the property itself, where the polling place is, when you've got a 100-foot buffer. When you go and you increase it three times that linearly, but it's actually nine times the area, you go from 30,000 square feet to 256,000 square feet, you're now on to private property. When we look at footnote 13 in the Burson case, it talks about this concern. It was a passing concern that the U.S. Supreme Court had because you didn't have record evidence in that case, and they pointed that out. The U.S. Supreme Court was very clear to point that out, and they said, look, if you're crossing highways and you're getting on to private property, that's an as-applied challenge because we don't see it here. In this case, Your Honor, we've got an entire folio, record evidence 50, of enforcement on private property. We've got the state going in there and telling a Republican Party headquarters that's located too close, hey, you know what, take down your signs and cover up the fact that you're a Republican Party headquarters. You can't even do that on Election Day. So I think the difference and the distinction here is that what began as in Burson, I'm going to call it a narrowly tailored statute that was on the constitutional side of the line, as the U.S. Supreme Court said, you were on the polling location itself is what was that issue there because of the narrow scope of that 100 feet. We're now well past that, and we're well past that. Let me ask you a question about that using an example that we're all familiar with here in Cincinnati. I was curious about this, so I paced off as imperfectly as my stride is. Fountain Square. Yes, sir. So if you go from the fifth-third building, which is on the east side of Fountain Square, and you go all the way to the next street, it's roughly 300 feet. So you would say, boy, that looks like an awfully long way. You can barely see somebody that far away. So it must be too far, right? I would say, Your Honor, that I think the closer you are to the polling location, the greater the state interest. And 300 feet sounds overly broad because when you actually pace it out, it looks like it's quite a ways. That's certainly part of it. Now, your client has, what is it, an auto body shop or something? He does, yes, Your Honor. So if he simply holds up a sign, what he describes as his passive activity, and he's 300 feet away, it's really sort of hard to see how that could intimidate a voter. Absolutely. Now, Fountain Square, as you're probably aware, also has a giant fifth-third electronic screen on the building across the street. So let's ignore zoning ordinances for a second. And on Election Day, your guy decides to put up a fifth-third bank size sign on his property. He's still 300 feet away. But this thing is gigantic. Understand? Yes, Your Honor. He lights it up, and he has images changing, right? Right. Now, he decides he doesn't like Candidate A because he thinks they support abortion rights. So he puts a giant aborted fetus on this sign 300 feet away, and he says, do not vote for Candidate A. He or she supports abortion. Is there intimidation there? I don't think there is, Your Honor, because you don't have this approaching of the voter. You're not interfering with the act of voting itself. And certainly, what if somebody goes and they send a mailer out to everybody in the voting area on Election Day, and now we're into the Mills v. Alabama case where you had the editorial that day and the U.S. Supreme Court said it's absolutely unconstitutional to prohibit. And what if somebody takes a full-page ad out in the paper that talks about Candidate A wanting to go and abort fetuses? What on earth does that have to do with 300 feet? Well, Your Honor, I guess my point is that that's not intimidating a voter. It's not dealing with voter fraud. It's not interfering with the act of voting itself. And those are the interests the U.S. Supreme Court said are the compelling interests that are at issue with these electioneering statutes. And going back to the sign, I don't think that those also interfere with the act of voting or deal with voter fraud. What we're looking for are people that are approaching the voters, interfering with the act of voting. We don't want them within a close proximity to the entrance of the voting place because it's interfering with the act of voting, or it could be dealing with certain aspects of voter fraud. The signaling issue that Mr. If somebody, if there's a 300-foot buffer and there are private homes within the 300 feet and the local newspaper is delivered on Election Day and it has some campaign ads in it, does that violate the statute? I think it would under the face of the statute, Your Honor, and I think that's part of the problem here. I think Mr. Russell picking up his cell phone and talking to his mom about who he wants to vote for on his private property violates the statute. I think Mr. Russell wearing a T-shirt within the confines of his business violates the statute. Mr. Russell posting something on Facebook violates the statute within the confines of his business. Mr. Russell accepting a phone call within his business from a pollster on Election Day violates the statute. Do these make it facially unconstitutional, or are all of these examples you're using more fairly in the as-applied area? Your Honor, I think it is facial because of the over breadth and the fact that we have so many examples. This isn't a narrow issue. Well, as I understand it, there are some eight states that are somewhere around 250, 300 feet. So it's not as if this is the only state that does that. So by inference, all those states are acting unconstitutionally. Your Honor, I think you've got to look at, of course, whether or not there's a private property exception. I think that that may tip the balance. I mean, these are closed questions, but certainly I think that there is an issue. And I think Burson stands for that. You look at Justice Scalia's concurrence, for instance, where he is looking at the national practice. I know, Judge Batchelder, you looked at it in authoring the Anderson decision. What are other states doing? And there is a national consensus. There's no doubt about it. I think it's 34 states are up to 100 feet, and then we've got eight more between 100 and 200. Clearly, 42 states believe that up to 200 feet is enough to prevent voter fraud and intimidation of voters. And so I think when you look at that national consensus, instead of saying, well, these states are in fact, you know, there's these eight states. A national consensus in that regard overrides state sovereignty. Your Honor, I don't think that it does, except for the fact that it goes to the questions in Burson. The state can do no more than serves the compelling interest of preventing voter fraud and intimidation with the act of voting itself. And so when we look at those concepts, what's necessary to do that? Well, if 42 states can get away with meeting those compelling interests with less than, you know, 200 feet. Burson clearly says it doesn't have to be the least restrictive. It does not. I agree. It does not. But along the same lines, it also cannot simply be arbitrary. And when we look at all of the First Amendment issues that are at issue that don't intimidate, that don't deal with voter fraud with this 300-foot statute that does not include a private property exception, I think we're on the unconstitutional side of the line. Well, if there doesn't have to – if the court has said that the state doesn't have to provide empirical evidence to support its claim that a certain number of feet are reasonable and aren't going to substantially impinge, I'm just having some difficulty with the idea that if you don't have to have any evidence, you don't then really have any standard for figuring out whether it's reasonable. I mean, you just said these other states are not being arbitrary. Why not if there isn't specific evidence? Your Honor, well, I think the 200- to 300-foot states, I think they've got constitutional issues. I think they do. I think also – So your line drawing is at 195. Well, Your Honor, I look at the consensus and I also look at what is necessary. Obviously, we know 100 feet is enough, 100 Burson. 100 feet, there's no question. The U.S. Supreme Court's upheld it in Burson. I think as you get out from that, though, you start to implicate more and more private property, which obviously the U.S. Supreme Court had an issue with in footnote 13. And I also think when you start to look at the area that's involved, which was what this court looked to in Anderson, we go from 30,000 square feet to approximately 284,000 square feet of area that we're prescribing free speech in. What is the reason for that? And when we look at the legislative history, and this was interesting too, what went on there? Why did Kentucky go back and revise to 300? And the simple reason was, well, this court struck down 500, so they were going to give 300 a shot and see if this court would uphold it. It wasn't that they put on legislative testimony. 50 feet was the standard, as this court made clear in Anderson, for over 100 years. And so we had this 50-foot ban, and Kentucky went in and said, we don't like people bothering voters. It had nothing to do with voter fraud and intimidation, and that was part of the basis of why this court struck the statute in Anderson. So we're going to go ahead and we're going to enact 500. And the same reasons was why they went back and they revised to 300. It had nothing to do with voter fraud or intimidation. This court addressed the signaling issue in Anderson as well. The signaling issue was resolved when the state went in and measured it from the entrance of the polling place instead of the polling booth itself. This court made that point in Anderson. There is no justification for this 300-foot statute, and it prescribes a great deal of First Amendment free speech. Your Honor, if there's no further questions, I'm almost out of time. Thank you. Thank you, Your Honors. I will be very brief in responding. I believe the briefs in this case adequately present most of the issues. I did want to address one point that the court has addressed, and that's voter intimidation is more than just approaching voters. The example that Judge McKee gave is obviously a very apt one, but I think it's an extreme example that can be illustrated on a much smaller scale. Certainly a gigantic Fifth Third style billboard could serve to intimidate voters. I don't think it has to be that broad. Voters can be intimidated by graphic images, condemnations to eternal damnation, any variety of things, and Kentucky's interest in preserving the integrity of its elections and ensuring that its citizens are not intimidated. Is a suggestion of condemnation to eternal damnation any less intimidating at 1,000 feet than it is at 500 or 300 or 1? I mean, I don't understand that on the intimidation, unless you're talking about physical intimidation. Even then, I don't guess I understand it. Well, and in a practical perspective from an impact on the person, it's not. But Kentucky under Burson has to have a reasonable law that does not significantly impinge on the rights, on the First Amendment rights of people like Mr. Russell. Mr. Russell has the ability under the First Amendment to tell people that they might suffer some ill from voting for certain candidates. However, Kentucky's interest in making sure that people can cast their votes unimpeded and unintimidated is the issue that we're addressing here. The 300-foot restriction keeps it basically to the polling place. As you drive to a polling place, you may live some 5,000 feet from a polling place. You may see any number of images express advocacy that's permissible under the First Amendment. What Kentucky is seeking to do is enjoin enforcement, or is enjoin individuals from attempting to intimidate people at the site of the voting, within 300 feet of the voting facility, where they're going to go and actually cast their votes. If we shift our focus from facial to as applied for a second, would you address yourself to what valid state interest it serves to prohibit this man at 290 feet or whatever it is, on private property, across a road, engaging in what, in part, he describes as passive electioneering, by which I think he means either holding up a sign or wearing a t-shirt. That doesn't have anything to do with signaling, and how on earth is that going to intimidate anybody? I think we have to broadly construe what intimidation means. The court in Burson recognized that voter intimidation and voter fraud is not necessarily the most overt acts, that it can be more subtle acts of intimidation. Someone perhaps could be intimidated by a, and I have never actually met Mr. Russell, but someone with a campaign t-shirt, for lack of a better term, casting a concerned look at voters as they walk into the polling place. Voter intimidation can take more subtle forms than overt intimidation. Do you understand that at 300 feet you can't even see his eyes? Well, at 300 feet from the entrance to the polling location, I don't think it's fair to presume that people are going to magically appear at the polling location. They have to traverse some distance to actually go in and cast their votes. So 300 feet from the entrance to the polling place is not necessarily 300 feet from where these people are arriving to vote. How about in this case? Do we have any idea where people traverse to get to this particular place? There is. There is record evidence in this case. I believe it's an overhead layout of this area, and Mr. Russell would have been across. There's a parking lot that comes out, and then there's a highway, and then across the highway would be Mr. Russell's business. Mr. Welbard, there's some reference to legislative history as to why the Kentucky legislature picked 300 feet. What, in your view, is the legislative history as to why they picked 300 feet? Well, I believe I have to concede some of what Mr. Weiss said, that the law was revisited simply because we had no valid electioneering law after this court's decision in Anderson. There is testimony in the record from former Secretary of State Trey Grayson that suggests we need to prevent voter harassment and intimidation and actually views specific examples of what could constitute intimidation. I believe Mr. Grayson's testimony was that smaller signs may not provide some intimidation, but larger ones, not necessarily on the scale that was suggested here, but could provide some level of intimidation. I think the legislative history would suggest that it was to attempt to allow people to cast their ballots free of intimidation. How about why the 300 limit was chosen? Is that strictly arbitrary, or is there some reason? I don't know that it's strictly arbitrary, but I don't know that there is any empirical evidence in the legislative history to suggest why 300 was chosen. One other thing that I'm curious about, in Anderson, as I understand it, there was legislative history, correct? And the conclusion the panel drew from that was that it was simply a ban, that history established that it was simply a ban on all electioneering activity as opposed to trying to prevent intimidation, signaling, whatever your other justifications are. So we got a history there. That's what doomed that statute, it seems to me, whether it was at 500 feet or not. Now, here, as I understand it, the way this worked, there was a preliminary injunction hearing scheduled, and either the judge suggested or you all agreed to roll the hearing on the merits up with the injunctive hearing, correct? That's correct. So there was no discovery, right? Well, there was some limited discovery prior to the preliminary injunctive hearing. Just from a timeline perspective, when this challenge was brought and when it became time to be adjudicated, the preliminary hearing was basically ramping up on the election. We were about a month out from the 2014 general election, and the district court judge was going on an extended vacation, was going to be out of town to not, basically, I think we had the argument on a federal holiday to accommodate having the hearing prior to the judge leaving. To have any resolution on this question, we had to speed it along. What I'm leading up to is it seems to me we're called upon to make some difficult constitutional decisions here, both facial and as applied, really with no record. Now, the question in part, then, should be, is there actually a record someplace, or if this was sent back to develop a record, is there nothing to put in? Having not in-depthly reviewed that, I'm confident that there would have been hearings and committee testimony on the matter. I'm not, I can't represent to the court how extensive that information would be. Yet, you didn't put it in. No, that's correct. It was not introduced, Your Honor. That's correct. It was your burden. And I do agree with that. However, I would submit that Kentucky's law, first of all, that we were not proper defendants to begin with, that we should not have been there having to defend it, but that also we were attempting to demonstrate the reasonability, the compelling state interest portion we felt was already satisfied under Burson. We were simply trying to show that it was reasonable and did not significantly impinge on Mr. Russell's constitutional rights, and we submit that it did not. Thank you, Your Honors. Thank you. The case will be submitted. Therefore, we adjourn the court.